IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Travis Antonio Harris, | ) | C/A No.: 1:15-3710-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

# I.    Relevant Background

## A.    Procedural History

On September 16, 2011, Plaintiff filed an application for DIB in which he alleged his disability began on September 3, 2009.[1] Tr. at 159–63. His application was denied initially and upon reconsideration. Tr. at 65–68, and 70–71. On May 23, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ethan A. Chase. Tr. at 29–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 4, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 16, 2015. [ECF No. 1].

## B.    Plaintiff's Background and Medical History

### 1.    Background

Plaintiff was 32 years old at the time of the hearing. Tr. at 33. He completed high school. *Id.* His past relevant work ("PRW") was as a combat support engineer, a construction worker, a welder, a stock clerk, a die case machine operator, and a security guard. Tr. at 50–51. He alleges he has been unable to work since September 21, 2009. Tr. at 250.

---

[1] Plaintiff indicated he last worked on September 20, 2009. Tr. at 250. S. Hawkins, an employee of the Columbia Social Security office, changed Plaintiff's alleged onset date to September 21, 2009, to be consistent with the termination of work activity. *Id.*

2.    Medical History

The record reflects that Plaintiff received all medical treatment through Veterans Affairs Medical Centers ("VAMCs").

Plaintiff underwent a compensation and pension ("C & P") examination for post-traumatic stress disorder ("PTSD") on October 17, 2007. Tr. at 367. He reported nightmares and sadness. *Id.* He described an incident that occurred in Iraq when his gun jammed after his convoy was fired on by a group of insurgents. Tr. at 368. He indicated he subsequently saw bodies burning on a bus. *Id.* He stated he had worked as a construction foreman, but had difficulty with irritability and concentration. *Id.* He reported some conflict in his marriage that resulted from his irritability and emotional withdrawal. *Id.* Phoebe McLeod, Ph. D. ("Dr. McLeod"), indicated Plaintiff demonstrated moderate to considerable symptoms of PTSD and impairment to social adaptability and interactions with others. Tr. at 369. She noted Plaintiff's abilities to maintain employment and perform job duties in a reliable, flexible, and efficient manner were moderately to considerably impaired. *Id.*

On November 23, 2007, Plaintiff underwent a C & P examination for evaluation of his spine. Tr. at 365. He reported increased pain, decreased mobility, and decreased range of motion ("ROM") in his spine. Tr. at 366. James Hamme, N.P. ("Mr. Hamme"), observed Plaintiff to have the following ROM in his lumbar spine: flexion to 90 degrees, extension to 30 degrees, lateral flexion to 20 degrees, and bilateral rotation to 30 degrees. *Id.* Plaintiff demonstrated mild paravertebral muscle spasm in his lumbar spine and was tender throughout his thoracic and lumbar spine. *Id.* Plaintiff had normal motor strength,

gait, and sensation. *Id.* Mr. Hamme indicated an MRI showed a congenitally small central canal at L3-4 with minimally bulging discs from L1 to L3. *Id.* A previous x-ray showed scoliosis of the thoracic spine. *Id.* Mr. Hamme diagnosed thoracic spine scoliosis, chronic lumbosacral strain with spasms, and minimal degenerative disc disease of the lumbar spine. Tr. at 367.

Plaintiff was hospitalized for depression and alcohol abuse from May 10 to May 13, 2008. Tr. at 361. He endorsed a one-year history of suicidal ideation and indicated he felt down and had difficulty sleeping. *Id.* He reported that he witnessed a lot of explosions that resulted in civilian casualties while he was serving in Iraq. *Id.* He indicated he had not attended counseling sessions over the past few months and had stopped taking his medications because of their inefficacy. *Id.* His providers diagnosed depression, not otherwise specified ("NOS") and post-traumatic stress disorder ("PTSD"). Tr. at 364. Plaintiff declined antidepressant medication. *Id.* His symptoms improved and he was discharged with instructions to avoid alcohol and to follow up for outpatient mental health treatment. *Id.*

Plaintiff underwent a sleep study on March 22, 2009, that showed him to have mild obstructive sleep apnea. Tr. at 375.

On February 16, 2010, Plaintiff presented to Mitchell H. Hegquist, M.D. ("Dr. Hegquist"), for a consultative examination. Tr. at 425–27. He reported symptoms of anxiety and depression. Tr. at 425. He complained of chronic low back pain that radiated from his hips to the lateral aspect of his thighs. *Id.* Dr. Hegquist observed Plaintiff to be moderately overweight at a height of 6' and a weight of 246 pounds. Tr. at 426. He

4

indicated Plaintiff had normal ROM of his neck, back, and extremities. Tr. at 426–27. He noted no tenderness or swelling in Plaintiff's extremities, SI joints, or sciatic notches. Tr. at 427. Plaintiff had normal gait and grip strength and no muscle spasms or atrophy. *Id.* He complained of pain with squatting and axial loading and tenderness to palpation of his lumbar spine. *Id.* Dr. Hegquist observed Plaintiff to be alert and oriented; to have grossly intact memory; to have normal thought processes, behavior, and intelligence; and to be competent to handle his own relationships and monetary funds. *Id.* He indicated x-rays of Plaintiff's lumbosacral spine were normal. *Id.*

Plaintiff presented to Robert D. Phillips, Ph. D. ("Dr. Phillips"), for a mental status evaluation on March 3, 2010. Tr. at 429–32. He reported depression, PTSD, and anxiety. Tr. at 429. He indicated he had little patience, was very emotional, and cried often. *Id.* He reported being able to bathe, dress, groom, brush his teeth, use the bathroom, walk, climb stairs, shop, perform light housework, do laundry, cook, administer medications, use the telephone, drive, and manage finances on his own. Tr. at 430. He endorsed a fair ability to follow directions, but poor abilities to focus on tasks, manage emotions, get along with others, and work without pain. *Id.* Dr. Phillips observed Plaintiff to be oriented to person, time, and place; to demonstrate some psychomotor agitation; to have fair long term memory; to have intact logical thinking and fair abstract thinking ability; to endorse hypervigilant and suspicious thought content; and to demonstrate a normal attention span. *Id.* He indicated Plaintiff was experiencing moderate to high levels of anxiety, depression, confusion, lethargy, and fatigue. Tr. at 431. He noted Plaintiff's responses suggested he was being truthful and not overemphasizing his symptoms. *Id.* Plaintiff

achieved a normal score on the Folstein Mini-Mental State Exam. *Id.* Dr. Phillips indicated Plaintiff was able to follow a simple direction; read and complete a simple written task; write a simple sentence; and copy a simple geometric shape. Tr. at 431. He concluded that Plaintiff experienced moderate to severe anxiety, but demonstrated no cognitive interference with focus or attention. *Id.* He determined Plaintiff appeared moderately to severely restricted in his ability to perform routine work in a normal work setting as a result of depression and PTSD. Tr. at 432. He stated Plaintiff's ability to function well and interact appropriately with peers and supervisors was limited and inconsistent. *Id.* He indicated Plaintiff was capable of understanding and following directions and seeing and avoiding dangerous situations and would not need help in handling finances. *Id.*

On March 6, 2010, state agency medical consultant Rebecca Meriwether, M.D. ("Dr. Meriwether"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment. Tr. at 434–41. She indicated Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balance; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. *Id.*

Plaintiff presented to medical student Malcolm Eggart ("Mr. Eggart"), for an internal medicine visit on April 6, 2010. Tr. at 443. He complained of continued low back pain. *Id.* He indicated he was noncompliant with his continuous positive airway pressure ("CPAP") machine because his mask did not fit well. *Id.* He endorsed frequent napping

and sleepiness during the day. *Id.* Mr. Eggart noted that Plaintiff had lost approximately 20 pounds. *Id.* Plaintiff reported depression as a result of family and financial problems, but stated he was enrolled as a full time student in barber school and enjoyed the work and association with other students. Tr. at 444. He complained of daily headaches, problems with balance, and dizziness. Tr. at 446. Mr. Eggart observed Plaintiff to have no point tenderness in his spine; no spasticity in his lower extremities, normal and symmetrical reflexes; grossly intact sensation; normal strength; and the ability to walk on his heels and toes. Tr. at 445. He prescribed Etodolac for back pain and headaches and indicated he may send Plaintiff for physical therapy after he completed barber school. *Id.* He referred Plaintiff for a pulmonology consultation for a new CPAP mask. Tr. at 448.

State agency consultant Lisa Klohn, Ph. D. ("Dr. Klohn"), reviewed the record and completed a psychiatric review technique form ("PRTF") on May 18, 2010. Tr. at 455–68. She considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and found Plaintiff to have moderate restriction of activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Klohn assessed Plaintiff's mental RFC and indicated Plaintiff was moderately limited with regard to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an

7

unreasonable number and length of rest periods; and to interact appropriately with the general public. Tr. at 469–70. She stated the following:

> Due to depression and PTSD, as reviewed on the PRTF on this same date, the claimant might have difficulty with complex tasks, but he should be able to attend to and perform simple unskilled work for reasonable periods of time without special supervision. He can attend work regularly, but might miss an occasional day due to his mental illness. He can make work-related decisions, protect himself from work-related safety hazards and travel to and from work independently. He can accept supervision and interact appropriately with co-workers, but might not be suited for work with the general public.

Tr. at 471.

Plaintiff visited Monica Wright, Ph. D. ("Dr. Wright"), for a C & P examination on May 18, 2010. Tr. at 496. Dr. Wright noted that Plaintiff was appropriately dressed and groomed; maintained good eye contact; was cooperative; and behaved appropriately. Tr. at 497. She indicated Plaintiff's attention, concentration, and short-term memory were somewhat impaired, but that he could name simple objects and perform simple calculations. Tr. at 498. Plaintiff's mood was dysphoric and his affect was depressed. *Id.* He was tearful during the evaluation. *Id.* Dr. Wright diagnosed PTSD. *Id.* She stated Plaintiff was capable of managing his own funds. *Id.*

Plaintiff participated in psychotherapy sessions on September 16, 2010, October 1, 2010, October 21, 2010, November 22, 2010, November 23, 2010, December 1, 2010, December 22, 2010, January 3, 2011, January 13, 2011, January 21, 2011, January 31, 2011, February 11, 2011, April 1, 2011, April 11, 2011, May 9, 2011, May 18, 2011, May 25, 2011, May 26, 2011, June 1, 2011, June 9, 2011, June 15, 2011, June 29, 2011, July 6, 2011, July 13, 2011, July 20, 2011, July 27, 2011, August 3, 2011, August 8,

2011, and August 15, 2011. *See generally* Tr. at 499–529 and 537–67. He reported symptoms that included nightmares, isolation from friends, poor sleep, difficulty being in crowds, fatigue, and anger. *See generally id.* He indicated he was unable to complete barber training because of problems with his grades that resulted from stress and poor concentration. Tr. at 546. Records reflect that Plaintiff was arrested for criminal domestic violence and malicious damage to property during this period; that his child's mother obtained a restraining order against him; and that he sometimes used alcohol to excess. *See* Tr. at 527.

On January 7, 2011, Plaintiff presented to the emergency department at Dorn VAMC and was diagnosed with low back pain and sciatica. Tr. at 567

Deborah Reyes, Ph. D. ("Dr. Reyes"), performed a psychological screening on January 28, 2011. Tr. at 545–49. Although Plaintiff endorsed a history of head injury, Dr. Reyes indicated his description of symptoms was more consistent with PTSD than head injury. Tr. at 545. She observed Plaintiff to be alert, attentive, and oriented times three. Tr. at 547. She indicated Plaintiff maintained good eye contact, interacted appropriately, was cooperative, and demonstrated no psychomotor problems. *Id.* Plaintiff's speech and language were normal and intact. *Id.* His mood was dysthymic and his affect was flat. *Id.* He reported no perceptual disturbances. *Id.* Dr. Reyes indicated Plaintiff had normal thought processes and content, an average fund of knowledge, intact memory, and good judgment and insight. *Id.* Plaintiff scored 45 points on Beck's Anxiety Inventory, which suggested severe anxiety. *Id.* He scored 34 points on Beck's Depression Inventory, Second Edition, which suggested severe depressive symptoms. *Id.* His responses to the

Military PTSD Checklist supported a diagnosis of PTSD. Tr. at 548. Dr. Reyes diagnosed PTSD and major depressive disorder. *Id.* She indicated that Plaintiff's memory problems and irritability should decrease if he were able to improve the quality of his sleep. Tr. at 549.

On February 15, 2011, Plaintiff presented to the primary care clinic with complaints of low back pain that radiated down his right leg. Tr. at 541. He requested that Tylenol with Codeine and Flexeril be refilled, and Emmet C. Maas, M.D. ("Dr. Maas"), renewed the medications. *Id.*

On April 19, 2011, Plaintiff underwent a second C & P examination with Dr. McLeod for PTSD. Tr. at 493. He endorsed symptoms that included emotional detachment from others, decreased interest in activities, disturbed sleep, irritability, anger, hypervigilance, low energy, and concentration problems. Tr. at 496. Dr. McLeod assessed PTSD and depressive disorder, NOS. Tr. at 495. She indicated Plaintiff was exhibiting considerable symptoms of PTSD that included intrusive thoughts of combat, nightmares, flashbacks, psychological and physiological reactivity, and avoidance of crowds and war-related news and movies. Tr. at 496. She described Plaintiff as having a constricted affect. *Id.* She indicated Plaintiff appeared to be capable of managing his own funds. *Id.*

On April 27, 2011, Plaintiff visited W. F. Ward, M .D. ("Dr. Ward"), for a general medical C & P examination. Tr. at 491. Plaintiff complained of low back pain that radiated down both legs and affected his abilities to lift, bend, stoop, and engage in prolonged sitting, standing, and walking. *Id.* Dr. Ward noted that Plaintiff stood and

changed positions frequently during the exam. *Id.* Plaintiff indicated he used a back brace and a transcutaneous electrical nerve stimulation ("TENS") unit. *Id.* Plaintiff demonstrated the following ROM of his lumbar spine: flexion to 35 degrees, extension to 10 degrees, lateral flexion to 20 degrees bilaterally, and rotation to 20 degrees bilaterally. Tr. at 492. Dr. Ward observed spasm and tenderness in Plaintiff's bilateral lumbar paraspinal muscles. Tr. at 493. Plaintiff had normal sensory function and deep tendon reflexes. *Id.* His gait was antalgic. *Id.* Dr. Ward assessed chronic low back strain, bilateral sciatic neuropathy, and degenerative disease of the lumbar spine. *Id.* He opined that Plaintiff's back problems were "sufficient to cause him to not be able to engage in physical or sedentary work for gainful employment." Tr. at 493.

Plaintiff presented to Dr. Maas for a routine primary care follow up on May 9, 2011. Tr. at 529–31. He reported daily headaches, bilateral knee pain, and low back pain. Tr. at 529. Dr. Maas noted some abdominal tenderness and elevated cholesterol, but no other abnormalities. Tr. at 530–31. He prescribed a statin medication for Plaintiff's cholesterol and refilled his other prescriptions. Tr. at 531.

On May 20, 2011, a computed tomography ("CT") scan of Plaintiff's head indicated mild mucosal thickening in his ethmoid air cells, but no other abnormalities. Tr. at 569. X-rays of Plaintiff's lumbosacral spine showed very minimal wedging of the L1 vertebra. *Id.*

Plaintiff was admitted for inpatient treatment for PTSD from August 21, 2011, through August 25, 2011, after expressing suicidal and homicidal ideations. Tr. at 589. He reported symptoms that included depression, helplessness, guilt, lack of energy,

decreased concentration, aggression toward others, nightmares, flashbacks, and symptoms of avoidance. Tr. at 589–90. Plaintiff's dose of Citalopram was increased, and the providers prescribed Aripiprazole to treat psychotic symptoms. Tr. at 590. He was noted to be "[e]mployable" at the time of discharge. Tr. at 592.

Plaintiff was subsequently placed in the mental health domiciliary program from September 9, 2011, to September 26, 2011. Tr. at 702. He was admitted to the hospital for an intentional medication overdose attempt from September 26 to September 30, 2011. Tr. at 586–87. His medications were adjusted and he agreed to a suicide safety plan. Tr. at 588. Stephen L. Byrd, M.D. ("Dr. Byrd"), indicated Plaintiff was "not currently employable due to severe symptoms of post-traumatic stress disorder." *Id.* Plaintiff was readmitted to the mental health domiciliary program from September 30, 2011, to December 9, 2011.[2] Tr. at 603 and 702. He attended psychiatric appointments and individual and group therapy sessions during his admission. *See generally* Tr. at 752–810, 817–48, and 863–98. He was initially required to obtain his medications through a pill line, but was allowed to administer his medications on his own beginning November 2, 2011. Tr. at 823. The discharge summary indicates Plaintiff's mental status was generally normal, aside from mildly restricted affect. Tr. at 704. Donald J. Brown, D.O., indicated Plaintiff had a good prognosis if he continued with treatment. *Id.*

On October 20, 2011, Plaintiff presented to Vidya Sridharan, M.D., for a primary care consultation. Tr. at 851. He reported constant low back pain, daily headaches, sleep

---

[2] During his admission to the domiciliary unit, Plaintiff was granted leave passes to visit family and attend appointments. *See* Tr. at 762, 767, 771–72, 778, 793, 809–10, 835–36, 848, 873, and 888

disturbance, and bilateral knee pain. *Id.* Physical therapist Daniel Muller issued hinged braces for Plaintiff's bilateral knees. Tr. at 848–49.

Jennifer L. Whitford, Ph. D., examined Plaintiff on November 3, 2011, and concluded that he had no documentation to support a traumatic brain injury ("TBI"). Tr. at 810–14. David A. Travillion, M.D., indicated Plaintiff endorsed a history of rocket-propelled grenade ("RPG") blast exposure in Iraq, but that his records did not indicate a resulting TBI. Tr. at 817. He suggested Plaintiff obtain statements from his team members as to his presentation following the RPG blast exposure. *Id.*

Plaintiff presented to Reginald V. Brown, M.D. ("Dr. Brown"), for a consultative examination on December 2, 2011. Tr. at 661–63. Dr. Brown observed Plaintiff to be tender to palpation of his lower lumbar spine, but to have no paraspinal muscle tenderness. Tr. at 662. He noted Plaintiff could bend to 60 degrees with pain. *Id.* Plaintiff's grip strength was 5/5 in both upper extremities. *Id.* Plaintiff had normal ROM of his upper extremities. *Id.* An x-ray showed a transitional thoracolumbar junction region and slight anterior wedging of the first lumbar vertebral body. Tr. at 664. His gait was normal. Tr. at 663. He had good ROM of his ankles, feet, hips, and knees. *Id.* Dr. Brown indicated Plaintiff was alert and oriented times three and could follow simple and complex commands. *Id.* His diagnostic impressions were PTSD, sleep apnea, and mechanical back strain. *Id.* He stated Plaintiff was able to perform ADLs. Tr. at 668.

On December 8, 2011, state agency consultant Clifford Guarnaccia, Ph. D. ("Dr. Guarnaccia"), completed a PRTF. Tr. at 674–87. He indicated Plaintiff had moderate restriction of ADLs; moderate difficulties in maintaining social functioning; moderate

difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. Tr. at 684. Dr. Guarnaccia also assessed Plaintiff's mental RFC and indicated he was moderately limited in the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or demonstrating behavioral extremes; and to respond appropriately to changes in the work setting. Tr. at 670–72. Dr. Guarnaccia further indicated Plaintiff would have difficulty with multitasking and carrying out detailed or complex instructions. Tr. at 672. He stated Plaintiff could sustain attention for two hour periods, but his concentration, persistence, and pace would vary. *Id.* He indicated Plaintiff could sustain an ordinary routine most of the time, but may need episodic reminders from a supervisor. *Id.* He stated Plaintiff may have some problems dealing with the public, colleagues, and authority figures in the workplace. *Id.* He indicated Plaintiff may become hypervigilant and paranoid and would need to be supervised closely and in an environment with little interpersonal demands. *Id.* He stated Plaintiff could adapt to very minor changes in his work tasks. *Id.*

State agency medical consultant Louise Tashjian, M.D. ("Dr. Tashjian"), reviewed the record and assessed Plaintiff's physical RFC on December 8, 2011. Tr. at 688–95. She indicated Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and occasionally crouch. *Id.*

Plaintiff presented to Georgia Lou Huff, M.D. ("Dr. Huff"), for a mental health visit on December 12, 2011. Tr. at 739. He reported nighttime awakenings, low energy, and poor memory and concentration. Tr. at 740. Dr. Huff instructed Plaintiff to take Aripripozole each morning to address symptoms of hallucinations, paranoia, and depressed mood; to take an increased dose of Prazosin at bedtime for nightmares; and to take Temazapan for sleep. *Id.*

Plaintiff followed up with Dr. Huff on January 3, 2012. Tr. at 722–25. He complained of severe headaches and indicated he often felt down and lacked motivation. Tr. at 722. He reported vivid nightmares, flashbacks, irritability, anxiety, depressed mood, anger, low energy, and impaired memory and concentration. *Id.* Dr. Huff observed Plaintiff to have a flat affect and a fair mood, but noted no other abnormalities on the mental status examination. Tr. at 723.

State agency consultant Janet Boland, Ph. D. ("Dr. Boland"), reviewed the record and completed a PRTF on February 29, 2012. Tr. at 899–912. She considered listings 12.04, 12.06, and 12.09. Tr. at 899. She assessed diagnoses that included major depressive disorder, PTSD, and alcohol dependence. Tr. at 902, 904, and 907. She found

that Plaintiff had moderate restriction of ADLs; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation that were of extended duration. Tr. at 909. Dr. Boland concluded that Plaintiff was "affected in most of his social and work functioning by his depression and PTSD," but remained "capable of performing unskilled work." Tr. at 911. She indicated Plaintiff was moderately limited in the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. Tr. at 921–22. Dr. Boland indicated Plaintiff would have some difficulty with multitasking and carrying out detailed or complex instructions. Tr. at 923. He stated Plaintiff could sustain attention for two-hour periods, but would have variable concentration and pace. *Id.* She indicated Plaintiff could sustain an ordinary routine most of the time, but would sometimes need reminders from a supervisor. *Id.* She stated Plaintiff may have some problems dealing with the public, colleagues, and authority figures in a workplace. *Id.* She indicated he may become

hypervigilant and paranoid and would need to be supervised closely in a work environment with few interpersonal demands and only very minor changes in work tasks. *Id.*

State agency medical consultant James Weston, M.D. ("Dr. Weston"), reviewed the evidence and completed a physical RFC assessment on February 29, 2012. Tr. at 913–20. He determined Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and occasionally balance. *Id.*

Plaintiff attended cognitive-behavioral therapy and psychotherapy with Kevin Petersen, Psy. D. ("Dr. Petersen"), on March 14, 2013, March 21, 2013, April 11, 2013, April 18, 2013, and April 25, 2013. Tr. at 959–60, 960–61, 963–64, 968, and 969–70. He primarily discussed his relationship, family, and financial problems during sessions. *See id.* Plaintiff also attended individual counseling sessions with a social worker and a domestic violence group session during this period. Tr. at 959, 960, 963, 965, 966, 967, 968, 970, and 973.

Plaintiff presented to psychiatrist Jesse O. Cavenar, III, M.D. ("Dr. Cavenar"), on May 1, 2013. Tr. at 953. He reported increased depression and anxiety symptoms as a result of his legal and financial problems. Tr. at 953. Dr. Cavenar prescribed Doxepin for depression and sleep disturbance. Tr. at 953–54. He described Plaintiff's affect as "mildly restricted," but noted no other abnormalities in his mental status. Tr. at 954–55.

Plaintiff followed up with Dr. Petersen on May 2, 2013, May 30, 2013, June 13, 2013, June 20, 2013, and June 28, 2013. Tr. at 944–45, 946–47, 948, 949–50, and 952–53. He attended individual counseling sessions on May 15, 2013, May 24, 2013, May 29, 2013, June 7, 2013, June 21, 2013, and June 26, 2013. Tr. at 945, 946, 949, 950, and 951–52.

Plaintiff presented to Dr. Maas for a primary care follow up visit on July 12, 2013. Tr. at 933. He reported stress related to a divorce and financial problems. *Id.* He complained of pain in his knees and low back, as well as intermittent abdominal discomfort. *Id.* Plaintiff indicated he was no longer using his CPAP machine. Tr. at 935. Dr. Maas described Plaintiff as having full ROM of his knees without erythema, effusion, or crepitus. *Id.* He continued Plaintiff's prescription for Meloxicam for back and knee pain and prescribed Psyllium for possible irritable bowel syndrome. *Id.*

Plaintiff followed up for therapy sessions with Dr. Petersen on August 1, 2013, August 8, 2013, August 22, 2013, September 12, 2013, September 26, 2013, October 3, 2013, and October 10, 2013. Tr. at 925, 927, 1000–01, 1002, 1005, 1008–09, and 1015–16. He attended group counseling sessions on July 15, 2013, August 14, 2013, August 19, 2013, September 10, 2013, September 11, 2013, September 23, 2013, and September 30, 2013, and individual counseling sessions on September 11, 2013, September 13, 2013, October 2, 2013, and October 9, 2013. Tr. at 931–32, 1001, 1002–03, 1003–05, 1006–07, 1008, 1009, 1010–11, 1016–17, 1017–18, and 1018–19. During this period, Plaintiff endorsed symptoms of grief following the death of his premature newborn son. *See* Tr. at 1006.

On October 16, 2013, Plaintiff presented to the emergency department with a complaint of back pain that was shooting down the left side of his leg. Tr. at 996. The provider diagnosed sciatica and administered a Toradol injection. Tr. at 997.

Plaintiff attended therapy sessions with Dr. Petersen on October 24, 2013, and October 31, 2013. Tr. at 985–86 and 989. He attended a group counseling session on October 21, 2013. Tr. at 992–94.

Plaintiff followed up with Dr. Cavenar on November 14, 2013. Tr. at 979. He reported stress as a result of legal and financial problems. Tr. at 980. He indicated he had seven children and was having difficulty making child support payments. *Id.* Dr. Cavenar indicated Plaintiff had a variable/labile mood and a mildly constricted affect. *Id.* He found that no changes to Plaintiff's medications were needed. Tr. at 981.

Plaintiff continued to present to Dr. Petersen and several social workers at the VAMC for counseling and therapy between November 2013 and January 2014. *See generally* Tr. at 974–85 and 1023–69. He reported increased depression and anxiety in December 2013. Tr. at 1024. He stated he was experiencing nightmares more frequently. *Id.* He endorsed increased stress as a result of unpaid child support payments, obstacles to him being physically present with his children, and an inability to afford Christmas presents. *Id.* He stated he lacked motivation and dreaded showering, but admitted that he continued to shower each day. *Id.*

On September 9, 2014, Plaintiff presented to Vernell K. Fogle, Ph. D. ("Dr. Fogle"), for a mental status examination. Tr. at 1073–76. Dr. Fogle indicated Plaintiff was neatly dressed, well-groomed, cooperative, and made good eye contact. Tr. at 1073.

He indicated Plaintiff's psychomotor activity was slightly below average and that he had a restricted affect. *Id.* He described Plaintiff as walking with a cane and having difficulty standing from a seated position. *Id.* Plaintiff reported symptoms that included flashbacks, nightmares, increased startle reflex, hypervigilance, mistrust of and estrangement from others, irritability, anger outbursts, intrusive thoughts, and avoidance. *Id.* He indicated he initially abused alcohol in an effort to escape his symptoms, but later turned to sexual promiscuity. Tr. at 1074. Dr. Fogle indicated Plaintiff's mental status was generally normal, but that he was occasional tearfully. Tr. at 1075–76. He diagnosed PTSD and major depression. Tr. at 1076. He stated Plaintiff "would likely have moderate difficulty in interacting with others at work." *Id.* He indicated Plaintiff could make simple and complex work-related decisions, but would likely have moderate difficulty in reporting to work on a daily basis, sustaining a consistent pace, and responding to increasing work pressures or changes in work routines. *Id.* On September 22, 2014, Dr. Fogle indicated Plaintiff had mild limitation in his abilities to carry out complex instructions and to make judgments on complex work-related decisions. Tr. at 1078. He stated Plaintiff had moderate limitation in his abilities to interact appropriately with the public; to interact appropriately with supervisors; to interact appropriately with coworkers; and to respond appropriately to usual work situations and to changes in a routine work setting. Tr. at 1079.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on May 23, 2014, Plaintiff testified he last worked as an armed security officer. Tr. at 33. He indicated he stopped working because he was suicidal and was suffering from PTSD, depression, and anxiety. *Id.* He endorsed problems with coworkers and management. Tr. at 43. He indicated his sleep apnea and insomnia caused him to be tardy for work. *Id.* He stated he often missed work because of his physical and mental impairments. *Id.* He indicated his employer allowed him to return to work after he was hospitalized for PTSD, but that the company eventually terminated him for continued problems. Tr. at 44.

Plaintiff testified that he was on active duty as part of the Army National Guard. Tr. at 44. He indicated he was involved in combat in Iraq. *Id.* He described his job as that of a combat engineer and indicated he had to clear rocks and check routes for improvised explosive devices ("IEDs") before convoys came through. *Id.*

Plaintiff endorsed symptoms of PTSD that included anxiety, inability to cope with stress, difficulty focusing, poor energy, nightmares, and problems interacting with others. Tr. at 35. He stated he had difficulty falling asleep and going back to sleep because of his nightmares and typically slept for four hours per night. Tr. at 35 and 48. He indicated he was hypervigilant, had intrusive thoughts, and felt suicidal. Tr. at 36. He stated his medications caused some fatigue and restlessness. Tr. at 38. He indicated he had been

hospitalized for psychiatric problems on four occasions. Tr. at 46. He endorsed one or two crying spells per week. *Id.*

Plaintiff testified he was 5'11" tall and weighed 260 pounds. Tr. at 45. He stated his weight fluctuated, but indicated he had gained and lost weight rapidly. *Id.* He stated he had sleep apnea and used a CPAP machine. Tr. at 48. He testified he had sciatic pain that radiated from his back through his legs. Tr. at 48–49. He indicated his pain affected his abilities to stand, walk, and balance. Tr. at 49.

Plaintiff testified he lived with his girlfriend. Tr. at 40 He indicated that his typical day involved tending to his personal hygiene, eating breakfast, engaging in household chores, and sometimes attending medical appointments. Tr. at 39. He stated he visited his psychiatrist each week. Tr. at 40. He indicated he drove, but denied driving long distances because of back and leg pain. Tr. at 39. He testified he attended church and his children's school events and occasionally ate in restaurants, but generally spent about 80 percent of his time at home. Tr. at 40 and 47. He stated he had to make a grocery shopping list because of poor short-term memory, but had no other difficulties in visiting the grocery store. Tr. at 41. He indicated he generally interacted appropriately with others. Tr. at 42.

Plaintiff testified that he would have difficulty working because he would have to work at his own pace and may have difficulty satisfying a manager. Tr. at 42. He stated he was incapable of standing for long periods. *Id.* He indicated he had been approved for 100 percent disability from the Department of Veterans Affairs ("VA") that was effective beginning in December 2010. Tr. at 49.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert Brabham, Jr., reviewed the record and testified at the hearing. Tr. at 50. The VE categorized Plaintiff's PRW as a combat support engineer as very heavy with a specific vocational preparation ("SVP") of three; a construction worker as heavy with an SVP of four; a welder as medium with an SVP of six; a stock clerk as heavy with an SVP of four; a die case machine operator as medium with an SVP of two; and a security guard as light with an SVP of three. Tr. at 50–51. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform unskilled, medium work that required he occasionally climb ladders, ropes, or scaffolds and that was low-stress and involved no fast-paced production quotas and only occasional superficial interaction with the public and coworkers. Tr. at 51–52. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a die cast machine operator. Tr. at 52. The ALJ told the VE to assume the hypothetical individual would be off task for 20 percent of the workday and asked if that would be acceptable in any job. *Id.* The VE indicated that being off task for 20 percent of a workday would exceed normal break time and would not allow for gainful employment. Tr. at 52–53.

2.    The ALJ's Findings

In his decision dated November 4, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
2.    The claimant has not engaged in substantial gainful activity since September 3, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: disorders of the back, posttraumatic stress disorder, and depression (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with lifting and carrying 50 pounds occasionally and 25 pounds frequently; no more than occasional climbing of ladders, ropes or scaffolds; unskilled, low stress environment, defined as no fast-paced production requirements with only occasional changes in work setting and occasional decision-making required; and occasional interaction with public and co-workers.

6.     The claimant is capable of performing past relevant work as a machine operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant has not been under a disability, as defined by the Social Security Act, from September 3, 2009, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 14–21.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ did not adequately consider the combined effect of Plaintiff's impairments;

2)     the ALJ did not accord sufficient weight to the VA's medical evaluations; and

3)     the ALJ did not adequately examine and explain his findings regarding Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Combination of Impairments

Plaintiff argues the ALJ did not properly consider whether his combination of impairments met or medically equaled a Listing. [ECF No. 12 at 2]. He maintains the ALJ considered each of his impairments individually and failed to consider their combined impact. *Id.* at 2–3. He contends the ALJ did not adequately consider the functional effects of PTSD or impairment to his back. *Id.* at 3–4. He argues that he is not required to identify a specific Listing that his impairments meet or equal to show that his combination of impairments render him disabled. [ECF No. 15 at 1]. He maintains the ALJ neglected to consider his severe and nonsevere impairments in combination. *Id.* at 2.

The Commissioner argues Plaintiff does not allege his impairments met or medically equaled any particular Listing. [ECF No. 13 at 8]. She maintains the evidence supports the ALJ's finding that Plaintiff's impairments did not meet or medically equal the Listings. *Id.* at 9–10. She contends the ALJ relied on the assessments of the state agency consultants, who reviewed the record and determined Plaintiff's impairments met none of the Listings. *Id.* at 10–11.

a. Combination of Impairments Under Listings

In determining whether a claimant meets one of the impairments in the Listings, the Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the Listed impairment. 20 C.F.R. § 404.1508. "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement . . . then [the claimant] 'is conclusively presumed to be disabled and entitled to benefits.'" *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (quoting *Bowen v. City of New York*, 476 U.S. 467, 470–71 (1986)). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). It is not enough that the impairment have the diagnosis of a Listed impairment, the claimant must also have the findings shown in the Listing of that impairment. 20 C.F.R. § 404.1525(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the claimant's burden to show that his impairment is presumptively disabling and to furnish medical evidence regarding his condition).

For a claimant to prove that his impairment medically equals a Listing, he must show one of the following: (1) that he has an impairment described in the Listings and has other findings related to his impairment that are at least of equal medical significance to the criteria specified in the Listing; (2) that he has an impairment that is not described in the Listings, but has findings related to his impairment that are at least of equal medical significance to those of a closely analogous Listed impairment; or (3) that he has a combination of impairments that do not meet any particular Listings, but are at least of

equal medical significance to those of closely analogous Listed impairments. 20 C.F.R. § 404.1526(b).

The ALJ found that Plaintiff's combination of impairments did not meet the severity requirements of Listings 1.04 or 12.04. Tr. at 15. He found that Plaintiff lacked marked restrictions and repeated episodes of decompensation. *Id.* He determined Plaintiff had mild restriction in ADLs, moderate difficulties in social functioning, and moderate difficulties in concentration persistence, or pace. *Id.*

Although Plaintiff argues he is not required to identify a particular listing that his combination of impairments meets or medically equals, the undersigned notes that 20 C.F.R. § 404.1526(b) requires that the claimant's symptoms be compared to closely analogous Listed impairments. It is necessary for "closely analogous Listed impairments" to be identified for this comparison to take place. *See* 20 C.F.R. 404.1526(c). The ALJ is required to identify relevant Listed impairments. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Here, the ALJ identified Listings 1.04 and 12.04 and provided reasons for concluding that Plaintiff's symptoms did not meet or equal the severity requirements under those Listings. *See* Tr. at 15. In the absence of a specific argument from Plaintiff as to the "closely analogous Listed impairments" that the ALJ failed to consider his combination of impairments under, the undersigned recommends the court find the ALJ did not err in assessing Plaintiff's combination of impairments under the Listings.

b.    General Consideration of Combination of Impairments

In determining whether a claimant's physical or mental impairments are severe enough to support a finding of disability, an ALJ must consider the combined effect of all the claimant's impairments, "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. The combined effect of the individual's impairments should be considered at each stage of the disability determination process. *See id.* When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and his disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* Despite its requirement that an adequate explanation be provided, the Fourth Circuit has declined to elaborate on what serves as adequate. *See Cox v. Colvin*, No. 9:13-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015); *Latten-Reinhardt v. Astrue*, No. 9:11-881-RBH, 2012 WL 4051852, at *4 (D.S.C. Sept. 13, 2012). This court has specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown*

31

*v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). Furthermore, absent evidence to the contrary, the courts should accept the ALJ's assertion that he has considered the combined effect of the claimant's impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

The ALJ found that Plaintiff's severe impairments included disorders of the back, PTSD, and depression. Tr. at 14. He determined that obstructive sleep apnea and obesity were nonsevere impairments and that there were no medical signs or laboratory findings to substantiate TBI or headaches as medically-determinable impairments. *Id.*

The ALJ stated that he considered Plaintiff's combination of impairments in determining whether they met or equaled a Listing. Tr. at 15. However, he did not specify that he considered Plaintiff's combination of impairments in assessing his RFC. Although the ALJ included multiple limitations in the assessed RFC, he did not explain why he found the particular limitations to accommodate Plaintiff's impairments. *See generally* Tr. at 16–20. Despite evidence of record that suggested Plaintiff's mental impairments were exacerbated by his sleep disturbance, the ALJ did not purport to consider Plaintiff's sleep apnea in determining whether his mental abilities were further compromised. *See* Tr. at 549 (indicating Plaintiff's memory problems and irritability should decrease if he could improve the quality of his sleep). His decision included no consideration of the

effect of Plaintiff's obesity on his back disorders. It contained no reflection as to whether Plaintiff's back pain affected his mental functioning. In the absence of an explicit statement from the ALJ that he consider Plaintiff's combination of impairments at each stage of the disability determination process, and because a reading of the decision as a whole does not reflect such consideration, the undersigned recommends the court find the ALJ did not adequately consider the combined effect of Plaintiff's impairments.

### 2.    Consideration of VA Evaluations

Plaintiff's counsel generally argues that the ALJ did not adequately evaluate and weigh the opinions of the VA's physicians and evaluators. [ECF No. 12 at 4–6]. He specifically cites the VA's rating decision and a September 30, 2011, statement that Plaintiff was "not currently employable" as a result of PTSD. [ECF No. 12 at 5, citing Tr. at 588]. In a letter dated April 5, 2012, the VA informed Plaintiff that his impairment rating for PTSD was increased from 50 to 70 percent disabling for the period from December 30, 2010, until September 8, 2011; from 70 to 100 percent disabling for the period from September 9, 2011,[5] to December 31, 2011; and back to 70 percent disabling beginning January 1, 2012. Tr. at 355. The letter indicated Plaintiff had an overall combined disability rating of 80 percent, but was entitled to compensation for individual unemployability[6] at the 100 percent rate beginning on December 30, 2010. *Id.*; *see also* Tr. at 353.

---

[5] The increase to 100 percent reflects Plaintiff's hospitalization for a period over of 21 days that began on September 9, 2011. Tr. at 355.

[6] "Total disability ratings for compensation may be assigned, where the schedular rating is less than total, when the disabled person is, in the judgment of the rating agency,

Although Plaintiff did not specifically cite the following, the undersigned's review also revealed the following additional medical opinion statements from VA physicians:

On April 19, 2011, Dr. McLeod indicated Plaintiff's PTSD and depression did not "render him unable to secure and maintain gainful employment," but she noted his "ability to maintain employment and perform job duties in a reliable, flexible, and efficient manner" was "considerably impaired" and that his mental impairments had "a considerable impact on his ability to do physical or sedentary work because of his concentration problems, difficulties being around others, his sleep problems, and his irritability." Tr. at 496.

On April 27, 2011, Dr. Ward examined Plaintiff and provided the following opinion on his ability to work:

> [I]t is my opinion, based on the information from the C file and my exam today, that this Veteran's back problems are sufficient to cause him to not be able to engage in physical or sedentary work for gainful employment. Bending, stooping, twisting and turning bother him. Prolonged sitting bothers him. He is unable to function in these capacities. Also he requires a number of medications which alter mental functioning, including narcotics, to control his pain. Therefore, it is my opinion that he is unable to obtain or maintain substantial gainful employment due to his service connected disabilities.

Tr. at 493.

The Commissioner argues that Plaintiff points to no specific reports, examinations, or evaluations that the ALJ neglected to consider. [ECF No. 13 at 14]. Although the

---

unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities: *Provided that*, if there is only one such disability, this disability shall be ratable at 60 percent or more, and that, if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more." 38 C.F.R. § 4.16(a).

undersigned recognizes that Plaintiff failed to cite the evaluations from Drs. McLeod and Ward, he did present a general argument that the ALJ failed to adequately consider the VA rating decision and the VA physicians' opinions. Therefore, the undersigned addresses each of these in turn.

a.    VA Disability Rating

Pursuant to SSR 06-3p, ALJs must consider disability decisions rendered by other agencies. Although the Social Security Administration ("SSA") is not bound by another agency's decision, ALJs must "explain the consideration given to these decisions in the notice of decision . . . ." SSR 06-3p. The Fourth Circuit has recognized a heightened explanation requirement for disability decisions rendered by the VA. *Bird v. Commissioner of Social Sec. Admin.*, 699 F.3d 337, 343 (4th Cir. 2012). The court acknowledged similarities between the VA's and the SSA's disability determination processes and concluded that "[b]ecause the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* It held that "in making a disability determination, the SSA must give substantial weight to a VA disability rating." *Id.* However, it provided that ALJs may give less than substantial weight to the VA's disability rating "when the record . . . clearly demonstrates that such a deviation is appropriate." *Id.*

The ALJ observed that Plaintiff's VA disability finding was related to his back, but noted that the evidence did not show "significant strength deficits, circulatory compromise, neurological deficits, persisting muscle spasms, fasciculations, or muscle

atrophy or dystrophy that are often associated with long standing, severe or intense pain, and physical inactivity." Tr. at 19. He noted that Plaintiff had "some musculoskeletal complaints with little objective findings" and that exams showed him to have normal gait, 5/5 motor function in all extremities, and intact cranial, sensory, and cerebellar nerves. *Id.*

In discussing Plaintiff's mental impairments, the ALJ noted that Plaintiff's VA disability was related to his PTSD, as well as his back. *Id.* He acknowledged that Plaintiff testified to anxiety and difficulties coping with stress, concentrating, and interacting appropriately and that treatment notes reflected that he endorsed nightmares, as times. *Id.* However, he stated that "almost all complaints involve anxiety/stress over unpaid child support for 7 children with 6 different mothers; family issues, relationship problems with girlfriend, divorce, non-payment of child support, situational depression over losing infant, and financial/legal/domestic violence issues." *Id.* He noted that mental status exams were unremarkable, aside from mildly constricted affect, variable mood, difficulty interacting with others, and symptoms of moderate clinical depression. *Id.* He observed that Plaintiff reported "fairly robust activities of daily living" and "successfully engaged in many community integration/leisure education activities." *Id.*

The ALJ indicated he gave "'significant,' but not great weight" to the VA's rating decision because it was "not based on Social Security Regulations and is not couched in terms of functional limits." Tr. at 20. He stated "the work-related mental limits and concentration, persistence and pace, social functioning, and stress tolerance were incorporated in the above residual functional capacity." *Id.*

The Commissioner contends the ALJ rightfully gave significant, but not great weight to the VA's disability determination because it was not based on Social Security regulations and did not specify particular functional limitations. [ECF No. 13 at 15].

The VA may find that a veteran is entitled to 100 percent disability compensation through a determination of individual unemployability.[7] 38 C.F.R. § 4.16(a). This requires that the veteran be found "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." *Id.* The VA's definition of "unemployability" is strikingly similar to Social Security's definition of disability as "the inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." *Compare* 38 C.F.R. § 4.16(a), *with* 42 U.S.C. § 423(d)(1)(A). Furthermore, the VA's individual unemployability finding is based on an individualized assessment of the veteran's record. *See* 38 U.S.C. § 4.16(a) ("Total disability ratings for compensation may be assigned . . . when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation . . . .").

---

[7] The VA's finding that a veteran is entitled to 100 percent disability because of unemployability differs from a 100 percent disability finding based on the VA's schedule for rating disabilities. *Compare* 38 C.F.R. § 4.16, *with* 38 C.F.R. § 4.25. The schedule for rating disabilities under the VA compensation system is "based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations." 38 U.S.C.A. § 1155 (2014). The schedule provides ten grades of disability that range from 10 to 100 percent. *Id.* Impairment ratings are based on the average reduction to the individual's "occupational earning capacity" and, therefore, an individual assigned an impairment rating of 100% would be "deemed totally disabled." *Id.* at n.10, citing *Swan v. Derwinski*, 1 Vet. App. 20 (Vet. App. 1990).

In the case *sub judice*, Plaintiff's 100 percent VA disability impairment rating was based on a finding of individual unemployability. *See* Tr. at 353, 355. Therefore, the VA examiners reviewed Plaintiff's record and made an individualized determination that he was unable to secure or follow a substantially gainful occupation. *See* 38 U.S.C. § 4.16(a). Although the ALJ was technically correct that the VA disability determination was "not based on Social Security Regulations," the similarities between the definition of disability used by the SSA and the VA's definition of "unemployability" shows little effective difference between findings of disability under the two programs. As the Fourth Circuit recognized in *Bird*, "both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability"; "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimant's to present extensive medical documentation in support of their claims." *Bird*, 699 F.3d at 343, citing *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). In light of the foregoing, the ALJ's assertion that he was not required to give great weight to the VA's decision because it was not based on Social Security regulations was insufficient to support a deviation from the VA's decision under the standard set forth in *Bird*.

However, the ALJ also supported his decision to deviate from the VA's decision by pointing out that the VA's decision was "not couched in terms of functional limits." Tr. at 20. Although the VA may have provided a more detailed explanation for its disability finding that possibly contained functional limitations, that explanation was not

38

included in the record. *See* Tr. at 353–56. In the absence of an explanation to support the VA's disability finding, the ALJ reasonably relied on the record before him and cited evidence from the period after the VA's decision that demonstrated decreased severity in Plaintiff's symptoms. *See* Tr. at 19. In light of the foregoing, the undersigned recommends the court find that the ALJ cited substantial evidence to support a deviation from the VA's decision under the standard set forth in *Bird*.[8]

### b.    Medical Opinions

ALJs must consider all medical opinions in the record. 20 C.F.R. § 404.1527(b). Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, quoting 20 C.F.R. § 404.1527(a).

The SSA's regulations require that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. If an ALJ declines to accord controlling weight to a treating physician's opinion or if the record contains no opinion

---

[8] Although the undersigned recommends the court find that the ALJ adequately explained his decision to give less than substantial weight to the VA's decision based on the evidence of record cited and that portion of the VA's decision that was before him, it is possible that Plaintiff may submit a detailed explanation for the VA's findings on remand. If additional documentation is submitted to support the VA's decision, it would be necessary for the ALJ to reconsider the VA's disability finding.

from a treating physician, the ALJ must consider all the medical opinions of record in view of the factors in 20 C.F.R. § 404.1527(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004)[9]; *see also* 20 C.F.R. § 404.1527(c)(4). Medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5).

It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has

---

[9] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ indicated he gave light weight to the September 2011 note that Plaintiff was "not currently employable due to severe symptoms of PTSD" because of the qualifier "currently" and the fact that "subsequent records mostly do not reflect severity of symptoms as they existed at that time, and claimant's complaints began to turn more towards situational stressors." Tr. at 19.

Plaintiff specifically alleges the ALJ did not adequately consider Dr. Byrd's September 2011 opinion. The Commissioner maintains the ALJ properly gave little weight to the VA psychiatrist's September 2011 opinion that Plaintiff was not employable at the time because records both before and after the statement indicated Plaintiff had less significant symptoms and was employable. [ECF No. 13 at 16]. She also contends that the VA psychiatrist's opinion was entitled to no particular weight because it was an opinion on an issue reserved to the Commissioner. *Id.*

The ALJ did not indicate that he gave "light weight" to Dr. Byrd's opinion because it was an opinion on an issue reserved to the Commissioner or because it was not supported by the records for the period before September 2011. *See* Tr. at 19. Therefore, the undersigned considers only whether the ALJ properly evaluated Dr. Byrd's opinion under the factors in 20 C.F.R. § 404.1527(c) and if substantial evidence supports the ALJ's decision to accord it light weight based on subsequent medical evidence that showed an improvement in Plaintiff's symptoms. *See Cassidy v. Colvin*, No. 1:13-821-

JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. Mar. 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

The undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff's subsequent records showed an improvement in mental health symptoms and complaints primarily consistent with situational factors in 2013 and 2014.[10] *See generally* Tr. at 925–1072. However, because Plaintiff alleged that his disability commenced on September 21, 2009, approximately two years before Dr. Byrd's statement, and in the absence of a discernible analysis based on the factors in 20 C.F.R. § 404.1527(c), the undersigned finds that the ALJ did not adequately consider the medical opinion. Although it was not unreasonable for the ALJ to conclude that Plaintiff's symptoms had improved based on the medical records for the period after January 2012, his rationale for giving light weight to Dr. Byrd's opinion is dismissive of evidence of disabling symptoms prior to January 2012. *See generally* Tr. at 250 (alleging Plaintiff last worked on September 20, 2009), 429–33 (containing consultative examination from Dr. Phillips dated March 3, 2010), 473–660 (including records from Dorn and Augusta VAMCs dated December 22, 2009, through October 4, 2011), and 696–898 (containing

---

[10] The undersigned notes a gap of more than 13 months in Plaintiff's VA treatment records. *Compare* Tr. 696–898 (SSA's Exhibit 14F, records from Augusta VAMC dated September 9, 2011, to January 28, 2012), *with* Tr. at 925–73 (SSA's Exhibit 18F, records from Dorn VAMC dated March 8, 2013, to August 9, 2013). It is unclear from the record whether this gap evidences a lack of treatment or a failure to obtain records for the relevant period.

records from Augusta VAMC dated September 9, 2011, through January 28, 2012). As an examining and treating physician, Dr. Byrd's opinion was presumably entitled to more weight than the opinions of non-examining physicians under the provisions of 20 C.F.R. § 404.1527(c)(1) and (2). *See* Tr. at 575 (treatment on September 27, 2011), 583–85 (treatment from August 22 to 25, 2011), and 586–92 (indicating Dr. Byrd as "staff psychologist" in discharge summaries for hospitalizations from August 21, 2011 to August 25, 2011, and from September 26, 2011 to September 30, 2011). Dr. Byrd cited subjective and objective findings to support his opinion, which presumably weighed in its favor. *See* 20 C.F.R. § 404.1527(c)(3); *see generally* Tr. at 586–92. His opinion was consistent with the record in that it was supported by the opinions of Drs. McLeod and Ward and the VA disability finding. *Compare Tr.* at 588, *with* Tr. at 353–56, 493, 496; *see also Stanley*, 116 F. App'x at 429; 20 C.F.R. § 404.1427(c)(4). His opinion was also presumably supported by his areas of medical specialization.[11] *See* 20 C.F.R. § 404.1527(c)(5). In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately consider Dr. Byrd's September 2011 opinion.

Additionally, the undersigned's review of the ALJ's decision reveals no evidence that he evaluated the medical opinion statements from Drs. McLeod and Ward. Thus, he failed to satisfy his duty under 20 C.F.R. § 404.1527(b) to consider all medical opinions of record.

---

[11] The medical licensing board on the South Carolina Department of Labor, Licensing and Regulation's website identifies Dr. Byrd as a physician specializing in addiction medicine and psychiatry. *See* Medical Board, South Carolina Department of Labor, Licensing and Regulation, https://verify.llronline.com/LicLookup/Med/Med.aspx?div=16 (last visited Jun. 9, 2016).

3.    Credibility Assessment

Plaintiff argues the ALJ failed to provide adequate reasons for finding that his statements were not credible. [ECF No. 12 at 6]. He maintains his testimony was supported by the medical record. *Id.* at 6–7.

The Commissioner argues the ALJ concluded that Plaintiff's allegations were not consistent with the evidence. [ECF No. 13 at 12–14]. She maintains the ALJ relied on the state agency consultants' assessments and inconsistencies between Plaintiff's testimony and the evidence of record. *Id.* She contends that, although the ALJ did not find Plaintiff's allegations to be entirely credible, his RFC assessment accounted for Plaintiff's credibly established limitations. *Id.* at 14.

In considering symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, the ALJ should first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p. After determining that the individual has a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of his symptoms to determine the limitations they impose on his ability to do basic work activities. *Id.* If the individual's statements about the intensity, persistence, or limiting effects of his symptoms are not substantiated by the objective medical evidence, the ALJ should reflect on the individual's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and

44

laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following when assessing the credibility of an individual's statements:

1.    The individual's ADLs;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*

The ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely credible." Tr. at 17. He later stated that Plaintiff's statement were "not persuasive." Tr. at 19.

Medical opinions from treating and examining physicians are particularly relevant to an ALJ's assessment of a claimant's credibility. *See* SSR 96-7p. Here, the ALJ neglected to consider two examining physicians' opinions and did not adequately consider a treating physician's statement. *See* Tr. at 493, 496, 588. He also failed to consider the combined effect of Plaintiff's impairments, which evidences neglect of potential factors that precipitated and aggravated his symptoms. *See* SSR 96-7p. In light of the aforementioned shortcomings, the undersigned recommends the court find the ALJ did not assess Plaintiff's credibility in view of the entire record as required by SSR 96-7p.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

June 9, 2016                                    Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).